UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES L. HODGES,<br>  Plaintiff, | :<br>:<br>: |
| v. | :   Case No. 3:06-CV-850 (PCD) |
| RENSSELAER HARTFORD<br>GRADUATE CENTER, INC.,<br>  Defendant. | :<br>:<br>:<br>: |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff James L. Hodges brings this employment discrimination action, alleging that his employment contract was not renewed because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), CONN. GEN. STAT. §§ 46a-58 et seq. Defendant Rensselaer Hartford Graduate Center, Inc. ("Rensselaer") moves for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons explained below, Defendant's Motion for Summary Judgment [Doc. No. 46] is **granted.**

### I. BACKGROUND

Plaintiff James L. Hodges was born on October 31, 1939. In 1970, Plaintiff Hodges, who has a doctorate in mechanical engineering, began working for Defendant Rensselaer as an Assistant Professor. In 1984, he was promoted to Professor and became the Chair of Engineering in the School of Engineering and Science. In recent years, Dr. Hodges was employed under a contract of academic appointment, which was subject to renewal every three years. His most recent contract covered the period July 1, 2003 through June 30, 2006, and stated in relevant part:

> With continued satisfactory performance, your appointment may be renewed at the end of the current term on mutual consent.... Renewal must be in writing and is subject to Rensselaer's discretion. Factors that will be considered include continued satisfactory performance, but also the existing financial, programmatic, and other organizational

needs of Rensselaer.

(Def.'s Mot. for Summ. J. Ex. 29 at 1-2.) On April 15, 2005, Dr. Hodges received a letter notifying him that his academic appointment would not be renewed at the end of the 2005-2006 school year. (See Compl. ¶¶ 8-10, 14-16.)

During the first half of this decade, Rensselaer suffered significant declines in enrollment and in revenues. Between Fiscal Years 2000 and 2005, it experienced a 52% drop in revenue and a 56% drop in enrollment. (See Def.'s Mot. for Summ. J. Ex. 5 at 7.) In particular, Rensselaer's engineering program at its Hartford Campus was consistently underperforming, and new engineering student credit hours steadily declined between 2002 and 2005. (Id. Ex. 7 at 8; Minasian Dep. at 34-35.) Rensselaer's financial situation had deteriorated to the point that it was compelled to freeze faculty members' salaries in 2004 and the Board of Trustees considered closing the Hartford Campus. (Minasian Dep. at 64, 111; Hodges Dep. at 35; Def.'s Mot. for Summ. J. Ex. 8.)

In the hopes of remedying the situation, Rensselaer hired John A. Minasian, Ph.D., as Vice President and Dean of its Hartford Campus in February 2005. (Minasian Dep. at 10.) Dr. Minasian had previously been a dean of Worcester Polytechnic Institute, where he had turned the school around after a similar decline in enrollment and revenue. (See Def.'s Mot. for Summ. J. Ex. 10.) Rensselaer hired Dr. Minasian with the expectation that he could quickly implement such a turnaround at Rensselaer, and he "was told by the trustees and president that we had two years to turn [the Hartford Campus] around or they would shut it down and a hundred [employees] or so would be out on the street." (Minasian Dep. at 34.)

Dr. Minasian set about improving Rensselaer's standing by instituting new programs and

evaluating Rensselaer's faculty according to their ability to advance the school's programmatic changes and to enhance the school's reputation through research and teaching. After reviewing Rensselaer's academic offerings, Dr. Minasian concluded they were traditional, "old and tired" courses that were not any more attractive than similar programs at other, less expensive schools. (Minasian Dep. at 35-36, 115.) To resurrect Rensselaer's reputation as a world-class institution and to make it more attractive to its corporate clients and students, Dr. Minasian sought to revitalize the academic programs by restructuring the format of some of the course offerings and by incorporating cutting-edge concepts such as entrepreneurship, innovation, sustainability, global markets, and technology commercialization into the traditional courses. (Id. at 50-51, 116; Def.'s Ex. 15.)

Implementing these program changes required faculty members who could customize their curricula to suit the new programs. Dr. Minasian determined that Rensselaer could not continue to employ faculty members who could only teach general, conventional courses and who did not demonstrate a proclivity for revising and customizing their curricula to suit different programs and clients' needs and interests. To provide the basic, standard courses in its new programs, Rensselaer could use adjunct professors, rather than full-time faculty members, in a more cost-effective manner. (See Minasian Aff. ¶ 6; Hodges Dep. at 199-200.) Dr. Minasian concluded that because adjuncts were likely to come from industry, they would be more current on the practical, interdisciplinary issues facing Rensselaer's students and could better adapt the subject matter of the courses accordingly. (See Minasian Aff. ¶ 7.)

Dr. Minasian testified at his deposition that he set about reviewing all full-time faculty members according to their ability to fulfill the new programmatic vision he hoped to implement.

3

Working under the relatively tight time line imposed by the Board of Trustees, Dr. Minasian reviewed each professor's background and experience, including their academic performance, scholarship, and service to the school, to determine the degree to which he believed they were capable of advancing Rensselaer's new initiatives, programmatic changes, and reputation. (Minasian Dep. at 18-20.) To decide whether to renew the contracts of faculty members whose terms were coming due, Dr. Minasian reviewed their "biosketches" (essentially the professor's curriculum vitae, which Rensselaer requires faculty to update annually), reviewed their personnel files, including their prior evaluations and employment contracts, and spoke with the Provost and others for additional input. (Id. at 22-32, 47.) Dr. Minasian relied primarily on the professors' biosketches because he believed they provided the most objective basis for his decision and clearly reflected the degree to which a professor could advance Rensselaer's programmatic changes and the degree to which a professor was engaged in scholarship that warranted Rensselaer's financial commitment to a particular faculty member. (Id. at 22-23.) Given the time table, he determined that he had to make hiring and renewal decisions based on faculty members' demonstrated performances and could not account for their future intentions. (Minasian Dep. at 18, 64, 68.) He testified that his nonrenewal decisions "didn't mean people didn't have the wherewithal sometimes to change[;] it meant that I didn't have the time frame to allow them all to change." (Id. at 92.)

Dr. Minasian presented his new programmatic vision to Rensselaer's faculty and administration at a meeting in February 2005. He stated his goals in a PowerPoint presentation entitled "Rensselaer at Hartford '06 Performance Plan," articulating his vision of transitioning the emphasis of Rensselaer's programs to suit cutting-edge clients' and students' interests and

strengthening the quality of programs and instruction. (See Def.'s Ex. 11 at 3.) He indicated that he intended to "[r]eview existing clinical faculty for excellence in teaching and scholarship," and that Rensselaer could differentiate itself by "[c]apitaliz[ing] on excellence in teaching and research," "[c]apitaliz[ing] on our strengths in Technology, Business, and Science," and "[p]rovid[ing] new services that take us out of a competitive role with second- and third-tier universities." (Id. at 4-7.) Under the heading "Our Programs" in his PowerPoint presentation, Dr. Minasian wrote, "Many of our programs are 'old and tired.'" (Id. at 12.) When asked to state who was responsible for the "old and tired programs," Dr. Minasian identified the "senior faculty of the university." (Minasian Dep. at 117.) In April 2005, Dr. Minasian held a community meeting further articulating his vision for the Hartford Campus and its development. (See Def.'s Ex. 4.)

In 2005, Rensselaer had four full-time faculty members in the Department of Engineering in addition to Dr. Hodges, three of whose contracts were set to expire at the same time as Plaintiff's. (See Minasian Dep. at 66; Def.'s Exs. 19-21.) Dr. Minasian reviewed each of their backgrounds to determine whether and to what extent they would comport with Rensselaer's new initiatives. Upon review of Dr. Hodges's updated biosketch, Dr. Minasian noted a deficiency in scholarship on Hodges's part that lagged far behind his colleagues. Dr. Hodges had not published a single book or article in almost twenty years, and he had rarely published before that time. (Minasian Dep. at 18-19, 23.) Dr. Hodges had last supervised a student masters thesis in 1985; had last contributed a chapter to a book in or around 1980; had last submitted an article to a refereed journal in 1988; had last submitted an article to a non-refereed journal in 1973; and had last given a professional lecture in 1973. (Def.'s Ex. 28; Hodges Dep. at 98-99.) According

to Dr. Minasian, Dr. Hodges's biosketch did not evince any other indicia that he was prepared to advance the new initiatives and programmatic changes at Rensselaer. Although Dr. Hodges had met the minimum level of teaching expected of a full-time faculty member, had advised students on matters other than masters theses, and had chaired the department, Dr. Minasian determined that his "background in both demonstrated and peer review journals, articles and his work in advising master students was insufficient to show a demonstrative performance." (Minasian Dep. at 18-19; see also id. at 86.) On April 5, 2005, Dr. Minasian met with Dr. Hodges to inform him of his decision to not renew Hodges's contract and gave him a letter which stated:

> As you are aware, the new initiatives in Hartford are predicated on significant changes in our curriculum. These initiatives require strengths in global security and corporate entrepreneurship and innovation. To accomplish these goals, we need to shift academic direction toward a refocused delivery of these initiatives. It is my regret that after a review of your academic background, it does not match program needs. For this reason we are informing you that your contract will not be renewed at the end of the contract period which is June 30, 2006.... Please be advised that this decision is not a reflection of your teaching or academic performance but rather a programmatic change and restructuring of faculty.

(Def.'s Ex. 30. See also Hodges Dep. at 131-34.) In contrast, Dr. Minasian concluded that the other full-time engineering faculty members—all of whom had published numerous books and articles, most of whom had supervised numerous masters theses, and all of whose biosketches reflected a far more active and varied teaching, research, and writing background than Dr. Hodges's[1]—had the academic background necessary to implement Rensselaer's new initiatives.

---

[1] For example, since joining the faculty in 1987, Dr. Ernesto Gutierrez-Miravete had supervised 3 masters theses and approximately 128 master seminar projects, 46 of which had occurred since 2000; had attended 29 conferences, symposia, or workshops, 10 of which had occurred since 2000; had conceived and developed more than 25 distinct new courses; had published one book; had published 12 articles in refereed journals, three of which were published since 2000; had presented 22 articles at refereed conference proceedings; had published 17 articles in other publications; and had given 4 professional lectures since 2000. (See Def.'s Ex. 23.)

Dr. Hodges was the oldest faculty member in the Mechanical Engineering Program when Dr. Minasian decided to not renew his contract. Around the same time, Dr. Minasian also decided to not renew the contracts of the oldest faculty members in the School of Management and in the Computer Science Program. (Pl.'s Ex. 2.)

In September 2005, Plaintiff filed a charge of age discrimination with the Connecticut Commission on Human Rights and Opportunities, which issued a release of jurisdiction letter on March 27, 2006. On June 1, 2006, Plaintiff filed the Complaint in this action, claiming that his contract was not renewed on the basis of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. (Count One) and in violation of the Connecticut Fair Employment Practices Act, CONN. GEN. STAT. §§ 46a-58 et seq. (Count Two). Defendant Rensselaer has moved for summary judgment on both counts of the Complaint.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine

7

issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 225. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").

## III. DISCUSSION

Hodges's age discrimination claims are analyzed under the three-step burden shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519, 524 (1993). See, e.g., James v. N.Y. Racing Ass'n, 233 F.3d 149, 153-54 (2000) (applying McDonnell Douglas to ADEA claims); Craine v. Trinity Coll., 259 Conn. 625, 636-37 (2002) (same for Connecticut state law discrimination claims). A plaintiff has the initial burden of establishing a prima facie case of discrimination by showing that, he was "(1) within the protected age group; (2) qualified for the position; (3) discharged; and (4) that such discharge occurred under circumstances giving rise to an inference of discrimination." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001) (quoting Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000)). A plaintiff's

establishment of a prima facie case gives rise to a presumption of unlawful discrimination, Carlton, 202 F.3d at 134, and the burden of production shifts to the defendant. If the defendant then proffers a "legitimate, nondiscriminatory reason" for the challenged employment action, Slattery, 248 F.3d at 93, "the presumption of discrimination drops out," Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001), and the plaintiff must prove that the legitimate reasons offered by the defendant were "not its true reasons but were a pretext for discrimination." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)). At all times, the ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated against the plaintiff. Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

**A. Prima Facie Case of Age Discrimination**

Rensselaer first moves for summary judgment on the ground that Hodges has not established a prima facie case of age discrimination. Rensselaer concedes that Hodges is a member of a protected class, was qualified for his position at Rensselaer, and was discharged. However, Rensselaer claims that Hodges cannot demonstrate the fourth element, that Rensselaer's decision not to renew his employment contract occurred under circumstances giving rise to an inference of age discrimination. In support of its argument, Rensselaer emphasizes Hodges's admission that no one at Rensselaer made any age-related or other comments that led him to believe that the school's decision was based on his age. (See Hodges Dep. at 173-74.) Rensselaer also contends that because Dr. Minasian is himself in the same protected class as Hodges and because no evidence exists that Dr. Minasian believed that older faculty were incapable of making changes to improve the success of the school's programs, Hodges cannot establish the fourth prong of his prima facie case.

9

The burden of establishing a prima facie case is not a heavy one. "One might characterize it as minimal." Carlton, 202 F.3d at 134. See also Hicks, 509 U.S. at 506; Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997) (per curiam); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (describing the burden of production as de minimis). In O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996), the Supreme Court held that the proper burden for the prima facie case is whether the plaintiff has presented "evidence adequate to create an inference that an employment decision" was based on an illegal discriminatory criterion such as age. Id. at 312 (internal quotation marks and citation omitted). One "reliable indicator" of age discrimination is "the fact that a replacement is substantially younger than the plaintiff[.]" Id. at 313; see also McInnis v. Town of Weston, 375 F. Supp. 2d 70, 82 (D. Conn. 2005). Although Rensselaer has not found a replacement for Hodges's exact position since his contract expired, his teaching duties have been assumed by younger professors (Pl.'s Ex. 2 at 2-3), a fact sufficient to give rise to an inference of age discrimination. See Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000) (where a 31-year old's replacement of a 60-year old gave rise to an inference of age discrimination); Carlton, 202 F.3d at 135-36 (prima facie case established where the 57-year old plaintiff's duties were transferred to employees 18 and 25 years younger); McInnis, 375 F. Supp. 2d at 82 (noting that district courts have held age differences "of more than ten years to be sufficient and those of fewer than five years to be insufficient"); McNulty .v N.Y.C. Dep't of Finance, 45 F. Supp. 2d 296, 299 n.3 (S.D.N.Y. 1999) (collecting cases). Plaintiff Hodges has therefore sufficiently demonstrated the fourth element of his prima facie case of age discrimination.

The fact that Dr. Minasian is 58 years old (see Minasian Aff. ¶ 10) and therefore in the

same protected class as Hodges does not undermine Hodges's prima facie case. The Supreme Court has rejected the presumption that one member of a protected class cannot discriminate against another member of the same class in the context of race and sex discrimination. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." (quoting Castaneda v. Partida, 430 U.S. 482, 499, 97 S. Ct. 1272 (1977))). Several courts have held that there is "no reason why the same reasoning should not apply to age discrimination cases." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003) (en banc); Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 361 (7th Cir. 2001) (explaining that the Seventh Circuit's "emphatic" rejection of the notion that one member of a protected class is unlikely to discriminate against another member of the same protected class in race-discrimination cases "applies with equal force to proof of age discrimination"); Gladysiewski v. Allegheny Energy Serv. Corp., No. 2:05-CV-992, 2007 WL 1112580, at *12 n. 16 (W.D. Pa. April 11, 2007); Puente v. Potter, No. SA-05-CA-747-XR, 2007 WL 869586, at *5 n.4 (W.D. Tex. March 20, 2007). Similarly, the fact that Minasian treated other protected class members favorably does not negate Hodges's prima facie case. The failure of a decision-maker to discriminate against other members of the protected class does not give rise to an inference that the decision-maker did not discriminate against Plaintiff. "[B]ecause the purpose of federal statutes such as the ADEA is 'protecting individuals, rather than a protected class as a whole,' 'an employer may not escape liability for discriminating against a given employee ... simply because it can prove it treated other members of the employee's group favorably." Vancour v. Bozzuto's Inc., No. 03-CV-2088 (JBA), 2006

WL 758636, at *7 n.6 (D. Conn. March 24, 2006) (quoting Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000)). See also Connecticut v. Teal, 457 U.S. 440, 453-55 (1982). Accordingly, the factual issues raised by Defendant do not cast doubt on the sufficiency of Plaintiff's prima facie case, and the burden shifts to Defendant to demonstrate a legitimate non-discriminatory business reason for not renewing Hodges's employment contract.

### B. Legitimate, Non-discriminatory Reason

Once a plaintiff establishes a prima facie case of age discrimination, the defendant is "not required to prove that the stated reason for discharging the plaintiff is true, but must state a 'clear and specific' reason for its conduct." Shkolnik v. Combustion Engineering, Inc., 856 F. Supp. 82, 86 (D. Conn. 1994) (citing Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.), cert. denied, 474 U.S. 829 (1985)). Rensselaer's evidence suggests that its decision to not renew Dr. Hodges's employment contract was based on objective information, specifically that Hodges's academic background and experience, particularly his lack of scholarship, did not qualify him to teach and implement Rensselaer's new initiatives and programmatic changes. In the letter to Hodges setting forth non-discriminatory reasons for the non-renewal of his contract, Dr. Minasian cited Hodges's academic background "not match[ing] program needs," and noted that this decision reflects "a programmatic change and restructuring of faculty." (See Pl.'s Opp. Mem. Ex. 6.) The record shows that Hodges had not published any books or articles in over 20 years, and Rensselaer has offered reasonable evidence that research and scholarship are inextricably linked to the performance and prestige of a university. (See Minasian Dep. at 60-61, 83; Younessi Dep. at 53; Def.'s Ex. 18 at 2.) Thus Rensselaer carries its burden of articulating and showing evidence of a legitimate, nondiscriminatory reason for not renewing Hodges's contract.

## C. Pretext

Because Rensselaer has offered a clear, legitimate, non-discriminatory reason for its decision to not renew Hodges's contract, the burden "shifts back to plaintiff to present sufficient evidence for a reasonable jury to conclude that defendant[ ] discriminated against him because of his age." Schnabel, 232 F.3d at 89 (internal marks omitted). "The ultimate issue in an ADEA case is whether the plaintiff has proved by a preponderance of the evidence that [his] age played a motivating role in, or contributed to, the employer's decision." Cooke v. Prototype & Plastic Mold Co., Inc., 220 F. Supp. 2d 104, 109 (D. Conn. 2002) (citing Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 76 (2d Cir. 2001)). The extent of this burden varies on a case-specific basis. Skiff v. Colchester Bd. of Educ., 514 F. Supp. 2d 284, 298 (D. Conn. 2007). The question of whether the evidence is sufficient to withstand summary judgment depends on "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." Reeves, 530 U.S. at 148-49. "Although a plaintiff need not necessarily introduce additional, independent evidence of discrimination, the prima facie case must be coupled with sufficient evidence to reject the employer's explanation as pretextual." Skiff, 514 F. Supp. 2d at 298 (internal citations omitted); see also Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381-82 (2d Cir. 2001). However, a plaintiff has not met his ultimate burden where "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves, 530 U.S. at 148. Furthermore, the Court should not second-guess the defendant's business decisions,

13

however unwise, so long as they are not made for discriminatory reasons. Skiff, 514 F. Supp. 2d at 298 (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988)).

In this case, Dr. Hodges argues pretext by challenging the inconsistent reasons offered by Rensselaer in support of its decision to not renew his contract, highlighting Dr. Minasian's comment that he sought to revamp the "old and tired" programs at Rensselaer, and emphasizing that the oldest people in two other departments were also terminated by Dr. Minasian and also filed CHRO complaints. First, Dr. Hodges points to the inconsistencies in the various reasons offered in excusing Defendant's decision to not renew his employment contract. In a letter dated April 5, 2005, Dr. Minasian wrote that the new initiatives required "strengths in global security and corporate entrepreneurship and innovation" and created a need to "shift academic delivery of these initiatives." Because Hodges's academic background did "not match program needs," Dr. Minasian wrote, his contract would not be renewed. He assured Hodges, however, that the decision was "not a reflection of your teaching or academic performance but rather a programmatic change and restructuring of the faculty." (Pl.'s Opp. Mem. Ex. 6.) In November 2005, however, Defendant stated to CHRO that its decision to not renew Hodges's contract "was based upon [Hodges's] background and experience, his work or lack of work for the school, programmatic changes at [Rensselaer] and restructuring of the faculty." (Pl's Ex. 3 at 2.) This explanation differs from the statement in Minasian's letter to Hodges that the non-renewal of his contract was not a matter of academic performance. In its response to Plaintiff's interrogatories dated January 11, 2007, and sworn to by Dr. Minasian, Defendant added "lack of scholarship" and "lack of service" to list of reasons offered to the CHRO to explain its non-renewal decision. Finally, at his deposition on May 8, 2007, Dr. Minasian added the following reasons to his

14

explanation of Hodges's non-renewal: Hodges's insufficient publication in peer-reviewed journals over the past 20 years; his insufficient advising of master students' theses over the past 20 years; his lack of community service; and his teaching, which Dr. Minasian testified includes scholarship, service, and classroom work. (Minasian Dep. at 18-20). The "principal" reason for his employment decision, he testified in conclusion, was Hodges's "lack of demonstrated scholarship in the areas that we were changing to, in our new programmatic areas." (Minasian dep. at 21.)

Plaintiff's attempts to undermine the validity of each of these reasons are futile. Plaintiff makes untenable arguments about the illegitimacy of Minasian's proffered reasons; for example, he flatly asserts that his failure to publish a single article in a peer-reviewed journal in the last 20 years cannot be equated with lack of scholarship. The Court is not persuaded that any one of Dr. Minasian's reasons, standing alone, is illegitimate. The question is whether the very fact that Defendant has tried to explain its employment decisions by offering different reasons suggests a pretext of discrimination.

When an employer offers inconsistent explanations for an adverse employment decision, "a genuine issue of material fact [exists] with regard to the veracity of [the] non-discriminatory reason." Carlton, 202 F.3d at 137. Accordingly, courts have found that an employer's inconsistent and varying explanations may create a jury question on the issue of pretext. Lyte v. S. Central Conn. Regional Water Auth., 482 F. Supp. 2d 252, 265 (D. Conn. 2007) (citations omitted); see also Roge, 257 F.3d at 170; EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994)). For example, in Carlton v. Mystic Transport, the employer stated in a letter to the EEOC that the plaintiff was terminated for "economic reasons" and that "the issue of performance

15

wasn't addressed nor was age the reason for the separation." Carlton, 202 F.3d at 137. However, in interrogatories responses and in depositions taken for the district court litigation, the employer stated that the plaintiff was fired for poor job performance, even though the employee had never received a negative written performance evaluation or formal warning. Id. The Second Circuit concluded that the employer's job performance justification was an "afterthought" and held that this inconsistency between the justifications offered for the plaintiff's dismissal raises a genuine issue of material fact with regard to the veracity of the non-discriminatory reason. Id.

Similarly, in this case, Rensselaer has offered various explanations for the non-renewal of Hodges's contract. In the notice of his non-renewal, Dr. Minasian explicitly stated that the employment decision was not based on Dr. Hodges's teaching or academic credentials (Def.'s Ex. 29 at 1-2), yet as this litigation proceeded Dr. Minasian added more and more reasons having to do with Dr. Hodges's academic credentials to the list of explanations for his employment decision. However, Dr. Minasian did state in the notice of non-renewal that the decision was motivated by the fact that Dr. Hodges's "academic background" did not "match program needs." This general justification could reasonably encapsulate the more particular deficiencies in Dr. Hodges's academic background—namely his lack of scholarship, in addition to his limited work with masters thesis students and waning service to the school—which Dr. Minasian offered as supplemental justifications at later points in this litigation. These shifting justifications are not overtly self-contradictory like those offered by the employer in Carlton, and they are not sufficiently inconsistent to raise a genuine issue of material fact with regard to the credibility of the defendant's assertions. See Pascal v. Storage Tech. Corp., 152 F. Supp. 2d 191, 204 (D. Conn. 2001) (granting summary judgment where defendant's stated reasons for terminating

16

plaintiff were inconsistent but the inference of pretext was weak because there was ample evidence that plaintiff's performance had not been exemplary.). Cf. Adams v. Master Carvers of Jamestown, Ltd., 91 F. App'x 718, 724-25, 2004 WL 335192, at *6 (2d Cir. Feb. 23, 2004).

Even assuming, however, that inconsistencies or other indicia of pretext are present in Dr. Minasian's justifications for not renewing Plaintiff's contract, they would not here support, either alone or in conjunction with the other evidence raised by Plaintiff, an inference that discrimination on the basis of age was the real reason for Plaintiff's non-renewal. See Timothy v. Our Lady of Mercy Med. Ctr., 233 F. App'x 17, 20, 2007 WL 1120344, at *2 (2d Cir. Feb. 21, 2007). Plaintiff has highlighted two other issues in the record which, even read in the light most favorable to the non-moving party, do not suggest a pretext of discrimination. First, Plaintiff argues that Dr. Minasian's PowerPoint presentation to the faculty in April 2005, in which he described many of Rensselaer's programs as "old and tired," shows Dr. Minasian's age bias. (See Pl.'s Opp. at 1, 6-7, 36-39.) However, it is clear that he used the phrase "old and tired" in this context to refer to older programs at Rensselaer, as opposed to the cutting-edge programs he sought to institute, and not to older-aged or otherwise senior faculty, and therefore does not raise an inference of age bias. (See Minasian Dep. at 114-15.) See Welch v. First Albany Corp., No. 97-CV-0861, 1999 WL 1069525, at *1 (N.D.N.Y. Nov. 18, 1999) (finding that the phrase "out with the old and in with the new" is "a colloquial expression [that] is not an age-related utterance."); see also McInnis, 375 F. Supp. 2d at 83 ("A stated preference for 'new' employees... is materially different from a stated preference for 'young ones.' While 'new' is not necessarily age-related, a reasonable trier of fact reasonably could consider a statement than an employer preferred 'young' to 'old' employees to be age-related."). Any reference Dr. Minasian might

17

have made to senior status in that presentation is also not a relevant factor to be considered in age discrimination cases because courts in the Second Circuit have consistently held that "senior status is not indicative of age, but rather the length of time an employee has worked for the employer." Cordes v. Gaymar Indus., Inc., No. 97-CV-825C(F), 1999 U.S. Dist. LEXIS 137171, at *20 (W.D.N.Y. June 22, 1999) (citing Ludovicy v. Dunkirk Radiator Corp., 922 F.2d 109 (2d Cir. 1990)).

Second, Plaintiff refers to Dr. Minasian's decisions not to renew the contracts of Frank Jenkins or Timothy Martyn, the oldest faculty members in the School of Management and in the Computer Science Program, respectively. However, these employment decisions were made in the broader context of a faculty restructuring which does not raise an inference of age bias on the part of Rensselaer. Dr. Minasian also decided to not renew the contract of a 48-year old faculty member, and he renewed the contracts of several faculty members and hired several new faculty members in their late 50s and early 60s. The Second Circuit has "cautioned against attributing much if any significance to the fact that another member of the protected class was discharged along with the plaintiff, especially where the numbers involved are small." Zimmermann, 251 F.3d at 382 (citing McCarthy v. N.Y.C. Tech. College, 202 F.3d 161, 165 (2d Cir. 2000)); see also Pollis v. New School for Social Research, 132 F.3d 115, 121-22 (2d Cir. 1997). In light of the number of faculty members under review by Dr. Minasian, the closeness in age of those hired as well as those terminated, and in the context of the the legitimate non-discriminatory program restructuring in which these faculty employment decisions were made, the evidence presented does not raise an inference of discrimination.

Taken together, the evidence presented does not raise a genuine issue of material fact as

to whether Rensselaer's reasons for not renewing Plaintiff's contract was pretext for age discrimination. No reasonable factfinder could infer discrimination from Rensselaer's faculty reorganization and programmatic changes in the wake of the school's financial crisis. Plaintiff's attempts to show that the engineering department had not been doing as badly as other parts of the Hartford Campus and that his termination did not immediately result in a significant change in the engineering programming do not raise inferences of discrimination. Whether or not Dr. Minasian's programmatic vision and new initiatives, including the termination of Dr. Hodges, achieved the desired business effects of boosting the school's enrollment and raising its revenues is a distinct question from whether the non-renewal of Dr. Hodges's contract was impermissibly motivated by age bias. The Court's role in reviewing a summary judgment motion is to gauge whether a defendant's justification for an employment decision was pretext for discrimination, not whether a defendant's strategy for business reforms ultimately panned out. See Dister, 859 F.2d at 1116 ("it is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal."). Although Dr. Minasian's slightly shifting justifications for his decision to not renew Dr. Hodges's contract may be marginally suspect, a defendant is entitled to judgment as a matter of law where the "plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves, 530 U.S. at 148. Reading the evidence in the light most favorable to the non-moving party, the Court finds no genuine issue of material fact exists as to Plaintiff's age discrimination claims, and Defendant is entitled to a judgment as a matter of law.

IV.  **CONCLUSION**

For the reasons stated above, Defendant Rensselaer's Motion for Summary Judgment [Doc. No. 46] is hereby **granted** in its entirety. The Clerk shall close the file.

SO ORDERED.

Dated at New Haven, Connecticut, this 19th day of March, 2008.

                                                /s/
                                      Peter C. Dorsey, U.S. District Judge
                                      United States District Court